**Slip Op. 01-120**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, SENIOR JUDGE**

| | |
|---|---|
| FUJIAN MACHINERY AND EQUIPMENT IMPORT & EXPORT CORPORATION, and SHANDONG MACHINERY IMPORT & EXPORT CORPORATION,<br><br>          Plaintiffs,<br><br>          v.<br><br>UNITED STATES, and THE UNITED STATES DEPARTMENT OF COMMERCE,<br><br>          Defendants,<br><br>          and<br><br>O. AMES COMPANY,<br><br>          Defendant-Intervenor. | **PUBLIC VERSION**<br><br>Court No. 99-08-00532 |

[ITA antidumping duty determination sustained in part and remanded in part]

Dated: September 28, 2001

Powell, Goldstein, Frazier & Murphy LLP (Lawrence R. Walders) for plaintiffs Fujian Machinery and Equipment Import & Export Corporation and Shandong Machinery Import & Export Corporation.

Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, Kenneth S. Kessler, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; Office of the Chief Counsel for Import Administration, United States Department of Commerce (John F. Koeppen), of counsel, for defendant.

Wiley, Rein & Fielding (Charles O. Verrill, Jr. and Eileen P. Bradner) for defendant-intervenor O. Ames Company.

**OPINION**

**GOLDBERG, Judge:** In this action, the Court considers plaintiffs' challenges to the final results of the Department of Commerce ("Commerce") for the seventh administrative review of the antidumping duty order on heavy forged hand tools ("HFHTs"). See Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China; Final Results and Partial Recission of Antidumping Duty Admin. Reviews, 64 Fed. Reg. 43,659 (August 11, 1999) ("Final Results"). Plaintiffs Fujian Machinery and Equipment Import & Export Corporation ("FMEC") and Shandong Machinery Import & Export Corporation ("SMC") argue that: (1) Commerce erred in determining that there was a total failure of verification at FMEC, SMC, and two of the supplier factories; (2) Commerce erred by denying plaintiffs' claims for separate company-specific dumping margin rates; and (3) Commerce acted unlawfully by using facts available, and in particular by applying adverse inferences, on the basis of alleged verification failures and subsequently discovered unreported sales.

The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1994).

**BACKGROUND**

On March 23, 1998, Commerce initiated the seventh administrative review of HFHTs. Initiation of Antidumping and

Countervailing Duty Admin. Reviews, 63 Fed. Reg. 13,837 (March 23, 1998).  With respect to the People's Republic of China ("PRC"), the review covered axes/adzes, bars/wedges, hammers/sledges, and picks/mattocks.  Id.  Commerce issued an initial set of questionnaires to plaintiffs on April 23, 1998. Supplemental questionnaires followed for SMC on August 7, 1998, for FMEC on August 10, 1998, and for both companies on September 15, 1998.  SMC and FMEC timely responded to all questionnaires.

On September 24, 1998, Commerce faxed the verification outlines for SMC and FMEC to the Washington office of plaintiffs' counsel.  Verification began at FMEC the morning of October 5, 1998, and lasted two days.  Subsequently, Commerce conducted verification at SMC October 8-9, 1998, and at two of the plaintiffs' suppliers' factories the following week: [

], termed "Factory A" by Commerce, on October 12-13, 1998; and [                                                    ], termed "Factory B" by Commerce, on October 14-15, 1998 (collectively, the "Factories").

On January 29, 1999, Commerce issued an internal memorandum determining that FMEC, SMC,[1] Factory A, and Factory B had each failed verification.  See App. ("Pls.' App.") to Pls.' Mot. for J. upon the Agency R. ("Pls.' Memo") 8, Determination of Adverse Facts Available Based on Verification Failure in the Admin.

_____

[1]  The letter refers to SMC as "SMEC."

Review of HFHTs from the PRC ("AFA Memo"). On February 9, 1999, FMEC's counsel wrote to Commerce requesting an opportunity to provide information that the memorandum had identified as unavailable during FMEC's verification. See Pls.' App. 9, Heavy Forged Hand Tools From the PRC--Clarification of Verification ("FMEC's Add'l Submissions Letter"). On February 26, 1999, Commerce denied this request as untimely. See Pls.' App. 10, Antidumping Duty Admin. Review of HFHTs from the PRC (1997-1998) ("Commerce's Add'l Submissions Letter").

On February 5, 1999, Commerce published the preliminary results of the antidumping review. Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the PRC; Preliminary Results and Partial Recission of Antidumping Duty Admin. Reviews, 64 Fed. Reg. 5,770 (February 5, 1999) ("Preliminary Results"). In the Preliminary Results, Commerce determined that sales of HFHTs from the PRC were made at less than fair value during the period of review, February 1, 1997, through January 31, 1998. Id. With respect to both FMEC and SMC, Commerce stated that "serious problems" at verification made it impossible to confirm that U.S. sales for either company were properly reported. Id. at 5,771. Commerce further determined that "the nature of the verification failures of both companies and the inadequacy of their cooperation" was such that neither FMEC nor SMC had established that it was entitled to a separate,

company-specific rate, rather than the government-entity rate otherwise applicable to exporters in non-market economies that fail to demonstrate an absence of government control over their export activities. Id. at 5,772. Finally, Commerce concluded that the non-responsiveness of the PRC's Ministry of Foreign Trade and Economic Cooperation ("MOFTEC"), as well as the verification failures of FMEC and SMC, demonstrated that the "PRC entity" (including FMEC and SMC) had failed to cooperate to the best of its ability, and that application of adverse facts available ("AFA") under 19 U.S.C. § 1677e(b) (1994) was therefore appropriate. Id.

On April 22, 1999, Commerce informed FMEC and SMC that a review by the U.S. Customs Service had disclosed several unreported sales of bars/wedges by both companies. FMEC and SMC filed comments explaining these unreported sales on May 10, 1999. See Pls.' App. 11, Heavy Forged Hand Tools From China ("Pls.' Unreported Sales Letter"). On August 3, 1999, Commerce issued a memorandum rejecting plaintiffs' explanations. See Pls.' App. 12, Antidumping Duty Admin. Review of HFHTs from the PRC (1997-1998)--Unreported Sales ("Commerce's Unreported Sales Letter").

On August 11, 1999, Commerce published the Final Results, in which it again determined that FMEC, SMC, and their suppliers' factories failed verification; that neither FMEC nor SMC warranted a separate rate; and that the application of AFA was

appropriate. See 64 Fed. Reg. at 43,661-69. Commerce assigned FMEC and SMC the following PRC-wide dumping margins: for axes/adzes, 18.72%; for bars/wedges, 47.88%; for hammers/sledges, 27.71%; and for picks/mattocks, 98.77%. Id. at 43,672.

## STANDARD OF REVIEW

The Court will sustain Commerce's Final Results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); accord Matsushita Elec. Indus. Co., Ltd. v. United States, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).

While Congress has thus directed the Court to test whether Commerce's Final Results are supported by substantial evidence, the Court of Appeals for the Federal Circuit has determined that a nominally different standard of review applies to one aspect of the methodology from which the Final Results are derived. In Micron Tech., Inc. v. United States, 15 Fed. Cir. (T) __, 117

F.3d 1386 (1997), the Federal Circuit observed that although

Congress has directed Commerce to "verify all information relied

upon in making . . . a final determination in an investigation

. . . [or] a final determination in a[n antidumping] review," 19

U.S.C. § 1677m(i)(3) (1994),[2] Congress never defined what

successful verification entails, 15 Fed. Cir. (T) at __, 117 F.3d

at 1394, and neither Congress nor Commerce has either specified a

particular verification methodology. Id. at 1395. Accordingly,

the Micron Tech. court looked to the Supreme Court's decision in

Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.,

467 U.S. 837 (1984), to derive the appropriate level of deference

due Commerce's verification methodology. See 15 Fed. Cir. (T) at

__, 117 F.3d at 1394.

In Chevron, the Supreme Court observed:

> If Congress has explicitly left a gap for the agency to
> fill, there is an express delegation of authority to
> the agency to elucidate a specific provision of the
> statute by regulation. Such legislative regulations
> are given controlling weight unless they are arbitrary,
> capricious, or manifestly contrary to the statute.

---

[2] Congress's directive to Commerce to verify information has not substantively changed between the pre-URAA law cited in Micron Tech., 19 U.S.C. § 1677e(b) (1988), and the current codification, except that the latter no longer requires Commerce "to report the methods and procedures used to verify such information." Id. That text was evidently deleted when Congress dropped the provision for using "best information available" in favor of "facts otherwise available," the sanction that now applies when information cannot be verified. See 19 U.S.C. § 1677e(a)(2) (1994). In any event, a similar reporting requirement applies under Commerce's own regulations. See 19 C.F.R. § 351.307(c) (2000).

Sometimes the legislative delegation to an agency is implicit rather than explicit. In such a case, the court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

Id. at 843-44 (footnotes omitted). Apparently in reliance on that language, the Micron Tech. court held, among other things, that "Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc. . . . Therefore, we review verification procedures employed by Commerce in an investigation for abuse of discretion,[3] rather than against previously-set standards." 15 Fed. Cir. (T) at __, 117 F.3d at 1396 (footnote added).

Insofar as this holding was based on a Chevron analysis, two recent Supreme Court decisions call its vitality into question. In Christensen v. Harris County, 529 U.S. 576 (2000), the Supreme Court held that an agency's interpretation of an ambiguous statute is not entitled to Chevron deference when that interpretation is expressed informally, as through an opinion letter, rather than through a regulation adopted after formal adjudication or notice-and-comment rulemaking. Id. at 586-88.

More recently, in deciding whether Customs Service

---

[3] The arbitrary or capricious standard cited in Chevron and the abuse of discretion standard cited in Micron Tech. are identical. See Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1994) (requiring reviewing court to set aside agency findings that are "arbitrary, capricious, [or] an abuse of discretion").

classification rulings deserved <u>Chevron</u> deference, the Supreme Court held that "administrative implementation of a particular statutory provision qualifies for <u>Chevron</u> deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, <u>and</u> that the agency interpretation claiming deference was promulgated in the exercise of that authority." <u>United States v. Mead Corp.</u>, 533 U.S. __, __, 121 S. Ct. 2164, 2171 (2001) (emphasis added). In <u>Mead</u>, the Court doubted that Congress had delegated to the Customs Service the authority to issue classification rulings with the force of law. 533 U.S. at __, 121 S. Ct. at 2173-74. More importantly, the Court observed that the Customs Service itself did not appear to have "set out with a lawmaking pretense in mind" in issuing the rulings, as they were not issued after notice and comment and did not bind third parties. 533 U.S. at __, 121 S. Ct. at 2174. Accordingly, the Court held that the classification rulings did not merit <u>Chevron</u> deference. 533 U.S. at __, 121 S. Ct. at 2175. Instead, such rulings, like the opinion letters at issue in <u>Christensen</u>, warrant judicial respect to the extent they have the "power to persuade," as determined by their "thoroughness, logic and expertness, [their] fit with prior interpretations, and any other sources of weight." 533 U.S. at __, 121 S. Ct. at 2175-76 (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)); <u>see also Christensen</u>, 529 U.S. at 587.

The proceedings in an antidumping investigation or administrative review constitute a very strange creature in the taxonomy of modern American administrative law.  Congress has stated that such proceedings are "investigatory" rather than adjudicatory, see NEC Corp. v. United States Dep't of Commerce, 21 CIT 933, 948-49, 978 F. Supp. 314, 329 (1997) (citing H.R. Rep. No. 96-317, at 77 (1979), and S. Rep. No. 96-249, at 100 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 486), aff'd 16 Fed. Cir. (T) __, 151 F.3d 1361 (1998); see also Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-316, at 892 (1994), although the Court of International Trade ("CIT") has observed that in substance they are quasi-adjudicatory.  See GSA, S.R.L. v. United States, 23 CIT __, __, 77 F. Supp. 2d 1349, 1359 (1999) (quoting Monsanto Co. v. United States, 12 CIT 937, 947, 698 F. Supp. 275, 283 (1988)). Given their anomalous classification, such proceedings may not constitute a suitable vehicle for Commerce to express statutory interpretations worthy of Chevron deference, particularly with respect to their more investigatory aspects, such as the conduct of verification.[4]  If Congress's delegation of authority to

---

[4]  To be sure, the Court in Mead did not restrict Chevron deference by classification of the administrative action, but it did suggest that the overwhelming majority of statutory interpretations deserving Chevron deference would be expressed through rulemaking or formal adjudication.  533 U.S. at __, 121 S. Ct. at 2172-73.

Commerce to derive a verification methodology is "implicit," and if that methodology is derived "ad hoc" and does not give rise to "set standards," see Micron Tech., 15 Fed. Cir. (T) at __, 117 F.3d at 1396, then Commerce does not "set out with a rulemaking pretense in mind" when it decides on a methodology for a given proceeding.[5] Cf. Mead, 533 U.S. at __, 121 S. Ct. at 2174. Thus, any statutory interpretation that Commerce expresses under such circumstances should not merit Chevron deference.[6] But cf. U.S. Steel Group v. United States, slip op. 01-110, at 12-14, 2001 WL 1012761, at *4-6 (Ct. Int'l Trade Aug. 31, 2001) (affording Chevron deference to Commerce's interpretation of the suspension agreement statute, while "mak[ing] clear that . . . [in antidumping cases] less deference may be owed by the Court of International Trade to agency interpretations in other contexts").

---

[5] It is perhaps regrettable that Commerce has seen fit to codify almost none of its verification practices. While that is its right, see SEC v. Chenery Corp., 332 U.S. 194, 202 (1947), the Court wonders whether the loss of flexibility would not be outweighed by the gain in predictability, particularly with regard to the procedural aspects of verification. Cf. Nippon Steel Corp. v. United States, 25 CIT __, __, 146 F. Supp. 2d 835, 842 (2001) (observing that Commerce's resistance to adopting definitive rules for the application of AFA increases the risk that its decisions will appear arbitrary).

[6] Instead, Skidmore deference would apply. See Mead, 533 U.S. at __, 121 S. Ct. at 2171-72. "Th[is] approach has produced a spectrum of judicial responses, from great respect at one end to near indifference at the other." Id. at __, 121 S. Ct. at 2172 (citations omitted).

The Court hesitates to reach this conclusion, however, for several reasons.  First, the Federal Circuit did not fully explicate its reasoning, so the extent to which its holding depends on <u>Chevron</u> is unclear.  Second, even if its holding does rest entirely on <u>Chevron</u>, <u>Christensen</u> and <u>Mead</u> are not directly on point, and a trial court may not disregard the controlling precedent of its appellate court where an intervening Supreme Court decision merely casts doubt on the continuing viability of that precedent, rather than directly overruling it.  Finally, there is another basis to support the Federal Circuit's determination that Commerce's verification methodology is reviewed for abuse of discretion: the residual standard of review applicable to the proceedings as a whole.

Under that standard, Courts must uphold "any determination, finding, or conclusion" that Commerce makes in an administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. §§ 1516a(b)(1)(B)(i), 1516a(a)(2)(B)(iii).  On at least one occasion prior to the Federal Circuit's decision in <u>Micron Tech.</u>, the CIT looked to this standard in determining that Commerce's choice of verification methodology should be reviewed for substantial evidence.  <u>See</u> <u>Hercules, Inc. v. United States</u>, 11 CIT 710, 726, 673 F. Supp. 454, 469 (1987) ("The decision to select a particular [verification] methodology rests solely within

Commerce's sound discretion. As long as there is 'substantial evidence on the record' to support the choice, the Court will sustain the methodology chosen by Commerce.").

Yet testing Commerce's choice of verification methodology for substantial evidence appears problematic on its face. Taking as an example one issue from the case at bar, see infra Part I.A.1.a, what does it mean to say that Commerce's decision to release the verification outline when it did must be supported by substantial evidence? Substantial evidence of what? Particularly with regard to the more procedural aspects of the verification methodology, the substantial evidence test seems awkward and inapt.

Perhaps for this reason, the CIT more commonly emphasizes the second half of the standard of review when examining an agency's methodology, by asking whether it is "in accordance with law." In Coalition for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States, 23 CIT __, 44 F. Supp. 2d 229 (1999) ("Coalition"), the court observed:

> Commerce need not prove that its methodology was the
> only way or even the best way . . . as long as it was a
> reasonable way. When an agency's method is challenged,
> [t]he proper role of this court is to determine whether
> the methodology used by the agency is in accordance
> with law, and as long as the agency's methodology and
> procedures are reasonable means of effectuating the
> statutory purpose, and there is substantial evidence in
> the record supporting the agency's conclusions, the
> court will not impose its own views as to the
> sufficiency of the agency's investigation or question
> the agency's methodology.

23 CIT at __, 44 F. Supp. 2d at 258 (citations, internal quotation marks, brackets, and original ellipses omitted). In other words, the agency's methodology must be reasonable, it must be in accordance with law, and it must effectuate the statutory purpose. But how does a court reconcile these precepts with <u>Micron Tech.</u>'s directive to review Commerce's verification methodology for abuse of discretion?

In fact, abuse of discretion is not a substantively different standard of review. Rather, "abuse of discretion" and "in accordance with law" are merely different phrasings of the same concept. <u>See</u> Administrative Procedure Act, 5 U.S.C § 706(2)(A) (requiring the reviewing court to overturn agency action that is "arbitrary, capricious, an abuse of discretion, or <u>otherwise not in accordance with law</u>") (emphasis added).

Neither, at least in most cases, are these standards any different than substantial evidence review, historical conceptions to the contrary notwithstanding.[7] Instead,

---

[7] Traditionally, de novo review and abuse of discretion review have been conceived as lying at opposite ends of a continuum of deference, with substantial evidence review falling well on the side of greater deference, yet still distinctly less deferential than abuse of discretion. <u>See, e.g.</u>, <u>In re Gartside</u>, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (observing that substantial evidence "is considered to be a less deferential review standard than 'arbitrary, capricious'") (citing <u>American Paper Inst., Inc. v. American Elec. Power Serv. Corp.</u>, 461 U.S. 402, 412-13 n.7 (1983); <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 143 (1967)). However, then-Judge Scalia was among the first to note that an agency action can pass muster under substantial-evidence review but still fail under the supposedly more lenient abuse of

substantial evidence and arbitrary and capricious "connote[] the same substantive standard of review." Bangor Hydro-Elec. Co. v. FERC, 78 F.3d 659, 663 n.3 (D.C. Cir. 1996). Substantial evidence "is no more than a recitation of the application of the 'arbitrary and capricious' standard to factual findings." Maryland People's Counsel v. FERC, 761 F.2d 768, 774 (D.C. Cir. 1985) (Scalia, J.); see also Dickinson v. Zurko, 527 U.S. 150, 164 (1999) ("A reviewing court reviews an agency's reasoning to determine whether it is 'arbitrary' or 'capricious,' or, if bound up with a record-based factual conclusion, to determine whether it is supported by 'substantial evidence.'").

In contrast to substantial evidence review, arbitrary and capricious is not tethered to review of agency factfinding, but rather can serve as a catch-all standard when substantial evidence is inapplicable. See In re Gartside, 203 F.3d at 1312-13 (citations omitted). "[T]he arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the actual decision." Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir. 1994). Thus, it "more naturally fits a determination of a

---

discretion standard. See, e.g., Association of Data Processing Serv. Orgs., Inc. v. Board of Governors, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.) ("[A]n agency action which is supported by the required substantial evidence may in another regard be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'--for example, because it is an abrupt and unexplained departure from agency precedent.").

mixed question of factfinding and policy implementation." Bangor

Hydo-Electric, 78 F.3d at 663 n.3.[8]

Therefore, so long as Commerce's verification methodology

may be fairly characterized as a means to implement policy, the

abuse of discretion standard applies--but as another guise of the

statutorily-mandated substantial-evidence/in-accordance-with-law

test, not as a discrete or more stringent standard.

Alternatively, if Commerce's choice of verification methodology

is conceived as an exercise in statutory interpretation,[9] then

Skidmore deference is all it merits.

---

[8] By contrast, then-Judge Scalia noted that "the substantial evidence test applies almost exclusively to formal adjudication . . . which is . . . characteristically long on facts and short on policy--so that the inadequacy of factual support is typically the central issue in the judicial appeal." Association of Data Processing Serv. Orgs., 745 F.3d at 685 n.6.

[9] The Court doubts whether this is so. In an analogous case, in which the D.C. Circuit reviewed an agency's methodology for determining what actions satisfied a statutory requirement of "substantial compliance," the court observed:

> Chevron is principally concerned with whether an agency has authority to act under a statute.
>
> \*   \*   \*
>
> In the present case, however, there is no question that the [agency] had authority to define the circumstances constituting . . . substantial compliance. . . . The only issue here is whether the [agency's] discharge of that authority was reasonable. Such a question falls within the province of traditional arbitrary and capricious review.

Arent v. Shalala, 70 F.3d 610, 616-17 (D.C. Cir. 1995)

For the reasons given above, the Court cannot overrule its appellate court. Even if it were in a position to do so, however, the substantive result would likely be no different. Accordingly, the Court reviews Commerce's ad hoc verification methodology for abuse of discretion.

## DISCUSSION

FMEC and SMC move for judgment on the agency record pursuant to U.S.C.I.T. R. 56.2. They challenge Commerce's determination that they failed verification, Commerce's decision to apply the PRC-wide rates rather than separate rates, and Commerce's decision to apply adverse facts available. The Court considers each of these arguments in turn.

**I. Substantial Evidence Supports Commerce's Determination That SMC Failed Verification, But Its Findings Concerning FMEC and the Factories Are Not in Accordance with Law.**

**A. Verification of FMEC**

FMEC alleges two essential reasons why Commerce erred in determining that it failed verification: (1) Commerce conducted the verification in a manner prejudicial to FMEC by not allowing sufficient time either for pre-verification preparation or for the verification itself; and (2) FMEC provided substantially all the information Commerce requested, and the information it did not provide was immaterial.

**1. Timing issues related to verification**

**a. Release of the verification outline**

FMEC's first claim regarding the timing of verification concerns the date Commerce released the verification outline. Commerce did so the afternoon of Thursday, September 24, 1998, whereupon the outline was faxed to FMEC's counsel, who was already in China.  Thursday, October 1, and Friday, October 2, were both national holidays in China, during which time FMEC was closed for business.  FMEC's verification began on Monday, October 5.  Thus, FMEC had only four business days to consult the outline in preparation for verification.

FMEC argues that Commerce abused its discretion by issuing the verification outline only four business days prior to the start of verification.  See Pls.' Memo, at 22-26.  FMEC suggests that the resolution of this issue should be controlled by the Court's prior opinion in Rubberflex Sdn. Bhd. v. United States, 23 CIT __, 59 F. Supp. 2d 1338 (1999).  In Rubberflex, the Court held that Commerce abused its discretion by issuing a verification outline only two days prior to the start of verification.  Id. at 1349.

Commerce distinguishes Rubberflex on the grounds that FMEC had twice as much time for preparation as did the Rubberflex plaintiff.  See Commerce's Memo, at 32-33.  Commerce further argues that it followed its standard practice of issuing an outline not fewer than seven days prior to the verification, and that FMEC cannot prove that Commerce officials deliberately

ignored the Chinese holidays.  See id.  Finally, Commerce notes

that FMEC knew of and agreed to the verification date in advance,

and suggests that by such acceptance FMEC forfeited its right to

complain about the scheduling of the verification.  See id.

Although relevant, none of the considerations cited by

Commerce is dispositive.[10]  While four-day notice of the

verification outline may be insufficient in some cases, the Court

declines to adopt a per se rule.  Instead, the Court applies the

essential test of Rubberflex, which asks whether the verification

outline was issued so tardily as to "preclude[ FMEC] from having

a meaningful opportunity to participate in the review process."

Rubberflex, 23 CIT at __, 59 F. Supp. 2d at 1345.

In Rubberflex, the plaintiff produced record evidence

_____

[10]  While the Court cannot agree that FMEC's assent to the
verification date negates its right to protest the outline
release date, the Court does note that in Rubberflex Commerce
denied the exporter's request to delay verification to allow
further time for preparation.  See Rubberflex, 59 F. Supp. 2d at
1343.  By contrast, FMEC concurred in the scheduling of
verification and, upon the delayed issuance of the verification
outline, never indicated any concern to Commerce or suggested
that it would be unable to complete its preparations.  Moreover,
the Court is unwilling to charge Commerce with sole
responsibility for keeping track of foreign holidays.  If an
exporter foresees a problem with the scheduling of verification,
either initially or after Commerce delays issuing a verification
outline, it should inform Commerce immediately rather than wait
to make post hoc objections after a failed verification.  See,
e.g., Notice of Postponement of Final Antidumping Duty
Determination: Disposable Pocket Lighters from the PRC, 60 Fed.
Reg. 5,899, 5,900 (January 31, 1995) (exporters requested
postponement in part due to "scheduling conflicts resulting from
[their] observance of Chinese New Year").

demonstrating that the late issuance of the verification outline directly impacted its ability meaningfully to participate in the verification. In that case, as in this one, the verification outline instructed the subject of verification to present corrections to questionnaire responses at the start of verification. See 23 CIT at __, 59 F. Supp. 2d at 1346; Pls.' App. 5, Antidumping Duty Admin. Review of HFHTs from the PRC Verification Agenda for FMEC ("FMEC Verification Outline"), at 1, 3. The Rubberflex plaintiff was unable to complete its corrections prior to the start of verification, Commerce subsequently refused to accept its corrected worksheets. See 23 CIT at __, 59 F. Supp. 2d at 1347. In the instant case, by contrast, FMEC evidently had no trouble successfully completing its corrections prior to verification. See Pls.' App. 16, Fujian Mach. & Equip. Imp. and Exp. Corp.: Report on the Verification of Sales Info. Submitted in the Admin. Review Covering February 1, 1997 through January 31, 1998 ("FMEC Verification Report"), at 2.

Of course, as this Court noted in Rubberflex, an outline facilitates the verification subject's preparations in other ways, by narrowing the scope of verification and identifying specific transactions on which the verifiers intend to focus. See 23 CIT at __, 59 F. Supp. 2d at 1347-48. However, FMEC has not made any showing that its preparations were actually materially prejudiced by the delayed issuance of the outline, or

that Commerce's stated reasons for finding a failure of verification follow in any way from the delay.  In order for the Court to take the "extraordinary step of ordering the parties to repeat verification," Rubberflex, 23 CIT at __, 59 F. Supp. 2d at 1349, FMEC must do more than complain that it did not have enough time; it must provide some record evidence to show that verification would have proceeded differently if Commerce had afforded it more time to prepare.

For example, the FMEC Verification Report and the Final Results both cite FMEC's failure to provide quantity and value worksheets as one of several factors supporting Commerce's determination that U.S. sales were unverifiable.  A credible allegation that FMEC lacked sufficient time to prepare such worksheets would constitute prima facie evidence that it was prejudiced by the delayed issuance of the outline.  By its own admission, however, FMEC failed to provide quantity and value worksheets for either of two reasons that were completely unrelated to the late issuance of the verification outline.[11]

_____

[11]  Before this Court, FMEC argues that it did not provide quantity and value worksheets because the verifiers neglected to request them until late on the second day of verification, after the accountant who had access to them had left for the day.  See Pls.' Memo at 8, 28-29.  FMEC had previously argued this same point to Commerce.  See Pls.' App. 7, Heavy Forged Hand Tools From China - Revised Case Brief Filed on Behalf Of FMEC, Shandong Huarong, TMC, and SMC ("Pls.' Case Brief"), at 24-25.  At the same time, however, and in an apparent self-contradiction, FMEC also stated that it was unable to prepare quantity and value worksheets because it lacked the requisite flexible accounting

Likewise, none of the other problems that Commerce identified at FMEC's verification are causally connected to the late issuance of the outline.[12]  Accordingly, because FMEC has not shown any prejudice, the Court finds that Commerce did not abuse its discretion by issuing the verification outline when it did.[13]

### b.  Time allotted for verification

FMEC's second objection related to the timing of verification concerns the actual duration of the verification. Specifically, FMEC argues that Commerce allowed insufficient time to conduct the verification, inflexibly adhered to a predetermined two-day schedule, and unfairly penalized FMEC for verification tasks that went uncompleted.  See Pls.' Memo, at 26-27.  FMEC claims that Commerce has previously allowed more than two days for verifications in the PRC, both in an earlier administrative review of the antidumping duty order at issue

---

system.  See id. at 23.

[12]  FMEC does argue in passing that "[s]ome of the problems encountered during the verification might have been avoided if FMEC had more time to prepare. . . ."  See Pls.' Memo, at 25. However, FMEC never identifies which problems might thus have been avoided, or, more importantly, ties such problems to the specific deficiencies cited by Commerce in the Final Results.

[13]  The Court observes once again that Commerce's statutory mandate is to determine dumping margins as accurately as possible.  See Rhone Poulenc, Inc. v. United States, 8 Fed. Cir. (T) 61, 67, 899 F.2d 1185, 1191 (1990).  To the fullest extent possible, verification should be a cooperative process.  The Court trusts that its decision on this issue will not promote future gamesmanship by either Commerce or exporters.

here,[14] and in reviews of other orders. See, e.g. Tapered Roller

Bearings and Parts Thereof, Finished and Unfinished, From the

PRC; Final Results of Antidumping Duty Admin. Reviews, 61 Fed.

Reg. 65,527, 65,542 (Dec. 13, 1996) (three-day verification).

FMEC largely blames its verification failure on the verification

officials, who it claims were unfamiliar with the case and wasted

precious time asking general questions. See Pls.' Memo, at 28.

FMEC also claims that the verifiers could have obtained much

of the information that the Final Results identified as not

provided. In particular, FMEC alleges that the verifiers waited

until after business hours on the second and final day of

verification to ask to see FMEC's voucher books and quantity and

value worksheets. See Pls.' Memo, at 28. By that time, FMEC's

American counsel had, with the verifiers' assent, already

proceeded to SMC to prepare for SMC's verification, and the FMEC

employees with access to the relevant information had gone home

for the day. Id. at 28-29; FMEC's Add'l Submissions Letter, at

2, 4. FMEC alleges that when its officials finally reached one

of the errant employees three and a half hours later, at 9:00

p.m., the verifiers said it was "too late" and that it was "not

---

[14] Although FMEC states that the verification of SMC took three days in a previous review, the case it cites does not discuss the length of any verification. See Pls.' Memo, at 27 (citing Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the PRC; Final Results of Antidumping Duty Admin. Reviews, 60 Fed. Reg. 49,251 (Sept. 22, 1995)).

necessary" for the employee to return to FMEC's offices to supply the requested information.  <u>See</u> Pls.' Memo, at 28-29; Pls.' Case Brief, at 24-25; FMEC's Add'l Submissions Letter, at 6.  FMEC further claims that when the verifiers caught up with its counsel at SMC's offices, they never indicated otherwise when he repeatedly asked them whether FMEC had supplied all requested information.  <u>See</u> FMEC's Add'l Submissions Letter, at 6.  Eleven days after publication of the AFA Memo, and four days after the publication of the Preliminary Results, FMEC's counsel wrote to Commerce alleging these facts and requesting an opportunity to submit documents unavailable during verification.  <u>See</u> FMEC's Add'l Submissions Letter.  Commerce denied the request as untimely.  <u>See</u> Commerce's Add'l Submissions Letter, at 1.

In its briefs before this Court, Commerce conversely blames FMEC for being unprepared and suggests that if it "had taken a few simple steps" to make its records more accessible, all tasks could easily have been completed in the allotted two days.  <u>See</u> Def. Memo. in Opp. to Pls.' Mot. for J. upon the Agency R. ("Commerce's Memo"), at 33.  Commerce does not specifically address FMEC's claim that it unfairly penalized FMEC for the temporary unavailability of documents at verification.  However, in the <u>Final Results</u>, Commerce averred that "[a]t no time during the verification did [FMEC] officials request additional time to provide the information."  64 Fed. Reg. at 43,663.

Based on the record before it, the Court is in no position to resolve which participants in the verification were comparatively less disorganized.  Regardless, FMEC's citations to cases in which verifications lasted longer than two days do not demonstrate the sort of consistent practice a deviation wherefrom Commerce would be obliged to explain.[15]  This Court has previously acknowledged Commerce's discretion in setting the length of verifications, in recognition of the time constraints imposed by statute for the completion of the review as well as limits on the agency's resources.  See Persico Pizzamiglio, S.A. v. United States, 18 CIT 299, 307 (1994); see also Micron Tech., 15 Fed. Cir. (T) at __, 117 F.3d at 1396 (affording Commerce "the latitude to derive verification procedures ad hoc").  Inasmuch as the parties concur that two days would have sufficed had the verification progressed more smoothly, the Court finds that Commerce did not abuse its discretion by allocating two days for FMEC's verification, and conducting it in that time.

However, Commerce's discretion in establishing and maintaining a schedule for verification, while great, is not unbounded.  At all times, "Commerce must give respondents a reasonable opportunity to participate in the review and verification process."  Rubberflex, 23 CIT at __, 59 F. Supp. 2d

---

[15]  Evidence of Commerce's practice in reviews of antidumping duty orders of different subject merchandise, in different countries, is of particularly dubious relevance.

at 1346.  <u>See also</u> <u>Böwe-Passat v. United States</u>, 17 CIT 335, 339 (1993) ("[T]he review process is bilateral and interactive.  The party must be afforded a reasonable opportunity . . . to satisfy evidentiary concerns.").  Where it becomes apparent in the course of a verification that strict adherence to the verification schedule will impinge a respondent's opportunity to satisfy evidentiary concerns, the verifying officials have two choices.

First, the verifiers may amend or adapt the verification schedule to allow the respondent additional time to meet their evidentiary requests.  Commerce's discretion in establishing and maintaining a verification schedule necessarily subsumes the ability to modify that schedule as the need arises.

Alternatively, if the exigencies of the verification schedule do not allow the verifiers to adapt it sufficiently to permit the full participation of the respondent, the verifiers must allow the respondent to submit requested documentary evidence shortly after the end of verification, pursuant to Commerce's own regulations.[16]  Specifically, 19 C.F.R. § 351.301 provides:

> (b) <u>Time limits in general</u>.  Except as provided in paragraphs (c) and (d) of this section and § 351.302, a submission of factual information is due no later than:

---

[16]  It is axiomatic that "Commerce, like other agencies, must follow its own regulations."  <u>Torrington Co. v. United States</u>, 14 Fed. Cir. (T) __, __, 82 F.3d 1039, 1049 (1996) (citing <u>Fort Stewart Schools v. Federal Labor Relations Auth.</u>, 495 U.S. 641, 654 (1990)).

\*     \*     \*

> (2) For the final results of an administrative review, 140 days after the last day of the anniversary month, except that <u>factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed</u>.

19 C.F.R. § 351.301(b)(2) (1998) (emphasis added). "Factual information," in turn, is defined in the regulations as: "(1) Initial and supplemental questionnaire responses; (2) Data or statements of fact in support of allegations; (3) Other data or statements of facts; and (4) Documentary evidence." 19 C.F.R. § 351.102(b) (1998).

The regulations are plainly written, and their meaning is clear: when verifying officials request information from a respondent, including data and documentary evidence in support of the respondent's questionnaire responses,[17] the respondent is not legally obligated to satisfy the request until a minimum[18] of one week after the conclusion of that respondent's verification.[19]

---

[17] Of course, the questionnaire responses themselves are typically due well before verification, according to Commerce's specification. <u>See</u> 19 C.F.R. § 351.301(c).

[18] <u>See</u> <u>Antidumping Duties; Countervailing Duties</u> 62 Fed. Reg. 27,296, 27,332 (May 19, 1997) (amending 19 C.F.R. §§ 351, 353, 355) (explaining that the word "normally" was added to a draft version of section 351.301(b)(2) "to clarify that the deadline can be extended where appropriate").

[19] In practice, a respondent should be fully prepared for verification and try to satisfy all requests for factual information immediately, not only because much evidentiary

In the instant case, the record suggests that FMEC was motivated to cooperate with the verifiers' evidentiary requests, but was unable to resolve complications that arose during the final hours of the verification, when its American counsel had departed and many of its employees had left work for the day. Under these circumstances, a request to submit temporarily inaccessible documents pursuant to 19 C.F.R. § 351.301(b)(2) would have been entirely reasonable. However, FMEC made no such request until after the release of the AFA Memo, see FMEC's Add'l Submissions Letter, long after the seven-day window provided by § 351.301(b)(2) had closed. In the Final Results, Commerce suggested that FMEC was responsible for this omission. See 64 Fed. Reg. at 43,663. FMEC conversely blames the verifiers for failing to inform it that its document production was inadequate, citing 19 U.S.C. § 1677m(d) (1994).[20]

The Court declines to consider whether the statute imposes such an affirmative duty on Commerce in the context of

---

documentation feasibly can only be inspected on-site, but also to reduce the risk that the verifying officials will find the information to be deficient. Otherwise, the respondent would have no time left to correct the deficiency, and Commerce would be entitled to use facts otherwise available in lieu of the respondent's information. See 19 U.S.C. §§ 1677m(d), 1677e(a)(2) (1994). The Court expresses no opinion as to whether this purely hypothetical scenario would support the use of adverse facts available under 19 U.S.C. § 1677e(b).

[20] Section 1677m(d) requires Commerce to give prompt notice of deficiencies in a response to an information request and to permit remedial action if practicable.

verification, because FMEC did not press the issue in its briefs before the Court.[21]  In this case, Commerce did not merely neglect to inform FMEC that certain responses were unsatisfactory; it implicitly represented to FMEC that the responses were satisfactory, on at least two occasions.  First, the verifiers told FMEC officials that it was "not necessary" to recall the employee with access to the quantity and value worksheets.  Inasmuch as the verifiers had already modified numerous information requests to take account of FMEC's rudimentary record-keeping, FMEC officials could reasonably have interpreted this comment as an indication that the verifiers did not consider the matter worth pursuing.

More importantly, when the verifying officials met up with FMEC's counsel at SMC's headquarters, they apparently remained silent in the face of his repeated inquiries as to whether FMEC had supplied all necessary information.[22]  Under the circumstances, FMEC's counsel could reasonably interpret their silence as an indication that FMEC had satisfied the verifiers'

---

[21]  Although FMEC cites the statute once, in its "Summary of Argument" section, see Pls.' Memo at 4, nowhere else in its briefs does it develop this argument.

[22]  Neither in Commerce's Add'l Submissions Letter, nor in the Final Results, nor in its briefs before this Court does Commerce ever contest FMEC's version of these events.  Thus, the Court assumes them to be substantially true.

information requests.[23]  The alacrity with which FMEC subsequently offered to provide the relevant documents, upon learning from the AFA Memo that Commerce considered them important, strongly suggests that FMEC would have submitted them immediately after verification had the verifying officials not implied that to do so was unnecessary.

The verifying officials should have known that their comments and actions would dissuade FMEC from timely submitting data that could facilitate the calculation of an accurate dumping margin.[24]  Therefore, Commerce abused its discretion by subsequently refusing to accept the proffered documentation.  Cf. Ta Chen Stainless Steel Pipe v. United States, slip op. 99-117, 1999 WL 1001194, at *12-14 (Ct. Int'l Trade Oct. 28, 1999)

---

[23]  For the same reason, the Court's determination on this issue is not altered by the brief remark in the Final Results that "[r]espondents maintained a list of data requests by [the verifiers] and understood what had been supplied and what was still pending."  64 Fed. Reg. at 43,664.  In the context of a verification in which the verifiers modified numerous requests, it would be unfair to expect FMEC's counsel to give more credence to this list than to the verifiers' representations.  Moreover, Commerce does not discuss this list in its brief before this Court.

[24]  In a previous case, the CIT declined to draw any inferences from the conduct of verifiers who left a verification early without informing the respondent that corrections to a database were unsatisfactory.  See Acciai Speciali Terni S.P.A. v. United States, 25 CIT __, __, 142 F. Supp. 2d 969, 986-87 (2001).  In that case, however, the respondent sought to require Commerce to use already-submitted data pursuant to 19 U.S.C. § 1677m(e) (1994); the instant case concerns Commerce's obligation to allow respondents to submit data pursuant to 19 C.F.R. § 351.301(b)(2).

(holding that a party's noncompliance with the deadlines established by the prior version of 19 C.F.R. § 351.301(b)(2) was excused by its reliance on Commerce's representations). Accordingly, the Court finds that Commerce must now afford FMEC the opportunity to submit those documents that it would have provided at the verification or immediately afterwards.

The Court limits its order to the information that FMEC would have provided at verification or in the seven days thereafter, but for the misunderstandings described above.[25] Needless to say, FMEC may not take this opportunity to craft new documentation to satisfy Commerce's information requests, as the CIT has repeatedly upheld Commerce's policy of rejecting verification data that was not generated "in the ordinary course of business." See, e.g., Heveafil Sdn. Bhd. v. United States, slip op. 01-22, at 8, 2001 WL 194986, at *3 (Ct. Int'l Trade Feb. 27, 2001) (citations and quotations omitted); see also Gourmet Equip. (Taiwan) Corp. v. United States, slip op. 00-78, at 10, 2000 WL 977369, at *3 (Ct. Int'l Trade July 6, 2000) (upholding

---

[25] In addition to the voucher books and quantity and value worksheets discussed above, there is record evidence tending to show that that FMEC did not provide the verifiers with other factual information, including documentation on short- and long-term investments, and financial records for two [          ], because of the same time constraints. See Pls.' Case Brief at 24, 26-27. Although FMEC does not specifically discuss these data in its briefs before this Court, the Court considers them to be subsumed within the category of "documents" that FMEC later petitioned Commerce to accept. See FMEC's Add'l Submissions Letter.

Commerce's rejection of an audit prepared solely for the antidumping review). Thus, for example, FMEC may submit quantity and value worksheets only if it demonstrates that it was prepared to do so at the time of verification.

### 2. FMEC's remaining arguments about verification

The last-minute problems with accessibility of documents do not explain all of the problems that Commerce found during and after verification. Two other key problems identified by Commerce were: 1) FMEC's failure to provide a complete list of sales; and 2) FMEC's total failure to report any sales of bars/wedges, an omission that Commerce learned about only after it had issued the Preliminary Results.

During the verification, the verifying officials requested a complete list of all products sold during the period of review, which FMEC was unable to provide. Instead, FMEC officials offered a complete catalogue of FMEC's products, explaining that it did not have an "integrated computer system."[26] Final Results, 64 Fed. Reg. at 43,662; Pls.' Case Brief, at 22-23. FMEC now argues that Commerce may not penalize it for its apparent lack of an advanced computing system, because the

---

[26] Although the record is contradictory, see supra at n.11, apparently the lack of such a system made it impossible for FMEC to create quantity and value worksheets. See Pls.' Case Brief, at 23. This point needs to be clarified on remand. If true, the analysis here would also apply to the failure to provide such worksheets.

antidumping laws require Commerce to "take into account any difficulties experienced by interested parties, particularly small companies, in supplying information," Pls.' Memo, at 21 (quoting 19 U.S.C. § 1677m(c)(2)), and to consider an exporter's individual circumstances, "including (but not limited to) the party's size, its accounting systems, and computer capabilities." Id. at 21 (quoting SAA at 865). Thus, FMEC argues, Commerce should have used its imperfect data pursuant to 19 U.S.C. § 1677m(e), which requires Commerce to accept information submitted by an interested party even if it does not meet all of Commerce's requirements, provided that

> (1) the information is submitted by the deadline established for its submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
> (4) the party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information, and
> (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e) (1994).

FMEC's arguments are unconvincing. The Court doubts whether FMEC, with total sales in 1997 of over [          ], qualifies as a small company. See Pls.' Case Brief, at 21. More importantly, there is ample evidence that the verifiers did adjust many of their information requests to take account of FMEC's peculiar difficulties. See, e.g., FMEC Verification

Report, at 7.  The law requires no more than this.  As the SAA

explains, Commerce is supposed to "explore alternative methods to

obtain the necessary data," SAA at 865, not waive the need to

obtain the data altogether.  The law is only "intended to

alleviate some of the difficulties encountered by small firms and

firms in developing countries . . . .  It is not intended to

exempt [such] firms from the requirements of the antidumping and

countervailing duty laws."  Id.  Because Commerce's mission is to

calculate accurate dumping margins, see Rhone Poulenc, 8 Fed.

Cir. (T) at 67, 899 F.2d at 1191, nothing in the law requires it

to accept incomplete data simply because an exporter has a

deficient computing system.[27]  Section 1677m(e) is of no avail to

FMEC, because FMEC has not demonstrated that a mere catalogue is

sufficiently complete as to provide a reliable basis for

Commerce's determination, or that it can be used without undue

difficulties, as required by § 1677m(e).  See Fabrique de Fer de

Charleroi, S.A. v. United States, 25 CIT __, __, 155 F. Supp. 2d

801, 808 (2001) (holding that Commerce had discretion to use

facts available after determining that alternative forms in which

exporter submitted information were too incomplete to be reliable

and could not be used without undue difficulties).

---

[27]  Evidence of FMEC's information technology shortcomings
is undeniably relevant to the question of whether it cooperated
to the best of its ability for the purpose of adverse facts
available.  See infra, Part III.

Moreover, the SAA also directs Commerce to consider the "prior success of the same firm" in providing the requested information in previous reviews. SAA at 865. There is no record evidence to show that this was a new or unusual information request. Accordingly, Commerce is entitled to disregard FMEC's sales catalogues.[28]

FMEC also failed to report any sales of bars/wedges, although it made [    ] such sales during the period of review. This omission was caught not during verification, however, but later, after the Customs Service responded to an inquiry by Commerce. FMEC explained to Commerce that it had inadvertently failed to report the shipments because it lacked a computerized record-keeping system, and its officials did not recognize the product name or code number while preparing their questionnaire responses. See Pls.' Unreported Sales Letter, at 4-5. For this reason, and because the sales of bars/wedges constitute a relatively small portion of FMEC's total sales of subject merchandise during the period of review,[29] FMEC argues that

---

[28]  Whether FMEC's failure to provide a complete list of sales is an isolated issue that may be remedied through application of partial facts available, or whether such errors instead corrupt the entire sales data and thus necessitates the use of total facts available, is an issue that Commerce must address on remand.

[29]  The unreported bars/wedges constitute [   ] percent of the value of all subject merchandise imported during the period of review. See Pls.' Memo, at 15. The Court notes, however, that treating each class of subject merchandise separately, as

Commerce acted contrary to law by citing these unreported sales as a basis for applying adverse facts available. See Pls.' Memo, at 13-17. FMEC also argues that because Commerce calculated separate dumping margins for each of the four classes of subject merchandise, its failure to report sales of bars/wedges should not affect Commerce's treatment of its sales of the other three types of merchandise. FMEC does not, however, seriously argue that Commerce may not use facts available to calculate a rate for bars/wedges. That Commerce may do so necessarily follows from the foregoing analysis regarding FMEC's sales catalogue.

It is not obvious to the Court how, where different types of subject merchandise receive different dumping margins, a flaw in the data that affects only one type of merchandise has any bearing on the data for the other types of merchandise. Commerce has not explained its reasoning. Accordingly, the Court finds that Commerce's determination that FMEC failed verification with respect to bars/wedges is supported by substantial evidence, but remands so that Commerce may explain how and why this failure affected its treatment of the other types of subject merchandise.

**B. Verification at SMC**

SMC contests Commerce's finding that it failed verification on the grounds that (1) like FMEC, it was hampered by the two-day

FMEC also urges, contradicts the logic its argument on this issue. Expressed in those terms, FMEC failed to report 100 percent of its bars/wedges.

time limit for verification[30]; and (2) it provided substantially all the information Commerce requested, and any information not provided was immaterial. See Pls.' Memo, at 29-32.

Commerce argues, as it did with respect to FMEC, that two days was sufficient for verification and that SMC's lack of preparation caused its verification failures. Commerce's Memo, at 33. Commerce also identifies a number of shortcomings in SMC's responses to its information requests. The most serious problems included the verifiers' lack of access to certain records; SMC's failure to provide information on its ownership interest in its U.S. affiliate, Pacific Tools; and the verifiers' inability to trace all sales due to SMC's rudimentary bookkeeping. Id. at 35-36; Final Results, 64 Fed. Reg. at 43,665. In addition, not only did the verifiers discover one unreported sale of mattocks at verification, but the subsequent review by the Customs Service disclosed that SMC had failed to report at least one shipment of bars.[31]

---

[30] SMC does not argue that the delayed release of the verification outlines impinged its participation, presumably because its verification began three days after FMEC's.

[31] The record is hopelessly confusing on this point. Based on the information supplied by the Customs Service, Commerce identified five unreported shipments of alleged subject merchandise that it attributed to SMC, listed in Pls.' Unreported Sales Letter and Commerce's Unreported Sales Letter as items 12 through 16.
Commerce now states that SMC did not ship the merchandise listed in item 12 or item 15, even though SMC previously acknowledged shipping item 12 and blamed the omission on its

The Court finds that SMC's claim that it was prejudiced by the conduct of verification is unfounded, and that Commerce has adduced substantial evidence supporting its finding that SMC failed verification.

### 1. Effect of the two-day limit for verification

Unlike FMEC, SMC has failed to prove that Commerce's manner of conducting verification thwarted its opportunity for meaningful participation, or was otherwise so prejudicial as to amount to an abuse of discretion. Although SMC characterizes its verification as plagued by "confusion and misunderstanding," see Pls.' Memo, at 29, it has previously acknowledged that the verification was comparatively well-organized, as the verifiers adapted their methodology in light of their experience at FMEC. See Pls.' Case Brief, at 30-32, 33. The verifiers began SMC's verification by discussing what information packages SMC should prepare, in recognition of the limits of SMC's accounting system; they listed each verification task in English and Chinese on a

---

rudimentary record-keeping system. See Commerce's Memo, at 20 n.6; see Pls.' Unreported Sales Letter, at 5-7. With respect to SMC's claim that the merchandise in items 13, 14, and 15 was not subject merchandise, Commerce stated that SMC failed to request a scope ruling and could not initiate such an inquiry itself. Commerce's Unreported Sales Letter, at 2-3. However, Commerce does not address SMC's claim that it did not ship the merchandise listed in items 13 or 14. See Pls.' Unreported Sales Letter, at 5-7.

The record lacks sufficient information for the Court to solve this puzzle. SMC has failed to press this point in its arguments before the Court, and in any event, has acknowledged responsibility for at least some unreported sales.

blackboard, and erased it upon its completion; they had all verification records brought into a single room for ease of access; and they identified the SMC officials with relevant information whom they expected to be available throughout verification. See id. at 30-31.[32]

In contradistinction to FMEC, SMC points to nothing in the record to suggest that the verifiers lulled SMC into a false belief that it had satisfied all requests for information. There is no evidence that the plaintiffs' American counsel ever asked the verifiers whether SMC had satisfied all information requests. Nor is there any evidence that the verifiers told SMC officials or SMC's counsel that it was "not necessary" to provide any missing information. As a general rule, the mere fact that the verifying officials erased any given task from the blackboard before it was completed to their satisfaction likely reflected a common recognition that SMC lacked the ability to provide the requested information. As Commerce explained to SMC prior to verification, under such circumstances its verifying officials

---

[32] According to SMC, at the end of its verification only one task remained on the blackboard: providing the records for Pacific Tools, its U.S. affiliate. See Pls.' Case Brief, at 31-32. Thus, there appears to have been enough, or nearly enough, time to complete all the verification tasks, especially since the verifiers significantly moderated their information requests because much of SMC's data had to be compiled by hand rather than by computer. See SMC Verification Report, at 8. This fact belies SMC's argument that the verifiers unreasonably sought "to audit the entire operations of [SMC]." Pls.' Case Brief, at 8.

were obliged to move on to the next task. See Pls.' App. 6, Antidumping Duty Admin. Review of HFHTs from the PRC Verification Agenda for SMC ("SMC Verification Outline"), accompanying letter at 2.

There is, however, one important disparity between SMC's account of verification and Commerce's version of events. SMC claims that Commerce continues to labor under a mistaken belief that SMC did not afford the verifiers access to the invoices and sales documentation of its Agriculture Department and No. 2 Hardware & Tools Department, which were responsible for sales of subject merchandise. See Pls.' Memo, at 31. According to SMC, the complete records were in the verification room throughout the entire verification. Lacking the vantage of a fly on the wall of that room, the Court cannot say which party is correct on this score. Yet even if the Court were to give SMC the benefit of the doubt, SMC's failure to take any remedial steps upon learning of Commerce's alleged misapprehension negates any inference that the verifiers hindered SMC's exercise of a legal right.

Specifically, there is no indication that SMC ever sought to provide temporarily inaccessible data pursuant to 19 C.F.R. § 351.301(b)(2), either immediately after the verification, or, by comparison with FMEC, after dissemination of the AFA Memo. It is uncontested that SMC was aware of its failure to provide the requested information concerning its U.S. affiliate, Pacific

Tools, yet at no stage of the proceedings did it ever attempt to remedy this omission. Instead, SMC merely argues that it did not need to provide information about Pacific Tools because such information was irrelevant to the proceedings. See Pls.' Memo, at 32; Pls.' Case Brief, at 43-44. Thus, it cannot impute its failure to provide sales information to the verifiers.

Likewise, even assuming that the verifiers neglected to apprise SMC of their belief that SMC had not made certain records available, their omission would only be relevant insofar as it excused SMC's obligation to comply with the time limits for the submission of information set forth in 19 C.F.R. § 351.301(b)(2). Because SMC never attempted to submit such information even after it became aware of the deficiency, it cannot show that it was prejudiced by the way Commerce conducted verification.

### 2. SMC's Non-Compliance With Information Requests

Commerce identified a number of problems with the information SMC submitted, or failed to submit, at verification. First, SMC's failure to provide access to invoices and other sales documents made it impossible for Commerce to perform a completeness test. See Final Results, 64 Fed. Reg. at 43,665. Second, SMC's explanation that information regarding its U.S. affiliate was immaterial is patently unacceptable. Commerce need not accept at face value a respondent's "mere statements" about the nature, quality, or relevance of the information it submits.

Cf. Fabrique de Fer, 25 CIT at __, 155 F. Supp. 2d at 808.

Otherwise, verification would be pointless.  Third, insofar as

Commerce was unable to trace all sales due to SMC's rudimentary

bookkeeping and computational capabilities, it is not required to

use SMC's incomplete data, for the same reasons that the Court

held that Commerce did not have to accept FMEC's similarly

imperfect information.[33]  See supra, Part I.A.2.  Finally, SMC

failed to report several sales of subject merchandise.  Such

omissions constitute substantial evidence supporting the use of

facts available, at least with respect to the classes of

merchandise that were not fully reported.  See id.

The Court finds that these errors and omissions, taken

together, constitute substantial evidence that SMC failed

verification.

## C.  Verification of Factory A and Factory B

After the verifications at FMEC and SMC, Commerce proceeded

to conduct verifications at Factory A and Factory B, owned by the

plaintiffs' suppliers.  Commerce determined that the Factories'

reported caps[34] were unreliable; that Factory A could not tie its

_____

[33]  The Court notes that SMC is [                        ] than
FMEC, with annual sales of [          ].  See Pls.' Case Brief,
at 32.  Nevertheless, the verifiers modified many of their
information requests to accommodate SMC's limited accounting
resources.  See, e.g., SMC Verification Report, at 8.

[34]  Caps are approximations, based on historical production
norms, of costs and quantities of inputs for factors of
production.

purchases of steel to its consumption of steel; and that Factory B had neglected to report three factor inputs altogether. Consequently, Commerce determined that both Factories failed verification. This failure was imputed to the plaintiffs, as the Factories do not export subject merchandise themselves, but only supply FMEC and SMC.

### 1. Treatment of caps

FMEC and SMC argue that Commerce abused its discretion by refusing to accept the Factories' use of caps in this review. They argue that the Factories have, in the ordinary course of business, always recorded inputs in the form of caps, and that Commerce has accepted this practice in each prior review. See Pls.' Memo, at 32. Commerce does not discuss the Factories' verifications in its brief before this Court, except to summarily recite their verification failures in its "Statement of Facts." See Commerce's Memo, at 8-11, 14-15. In the Final Results, however, Commerce stated that although it did confirm that the reported caps were "reasonable estimates of the weight of certain material inputs," see 64 Fed. Reg. at 43,665, it found them unreliable because the Factories could not trace the caps to their accounting records. See id. at 43,665-66.

FMEC and SMC protest that this latter requirement was an unreasonable departure from Commerce's practice in prior reviews, when it was content merely to weigh the inputs in order to verify

the reasonableness of the Factories' use of caps.  See Pls.'
Memo, at 34-35.  They argue that the Factories' rudimentary
accounting system does not permit the sort of product-specific
tracing[35] that the verifiers sought, and that Commerce should
have taken these limitations into consideration as required by
the SAA.  See id.; cf. supra, Part I.A.2.  Accordingly, they
claim that Commerce abused its discretion by changing its
methodology.

As a rule, Commerce is free to discard one methodology in
favor of another, the better to calculate more accurate dumping
margins.  See, e.g., NSK Ltd. v. United States, 19 CIT 1013,
1027, 896 F. Supp. 1263, 1275 (1995) (noting that Commerce need
not "adhere to its prior . . . methodology, especially where
Commerce is striving for more accuracy"), aff'd in part and rev'd
in part on other grounds, 15 Fed. Cir. (T) __, 115 F.3d 965
(1997).  There are, however, two restrictions on its liberty to
do so.  First, Commerce may not make minor but disruptive changes
in methodology where a respondent demonstrates its specific

---

[35]  From the record, it appears that the Factories use most
inputs, such as labor or paint, to produce a variety of goods,
including both subject- and non-subject merchandise.  Their
accounting records do not record actual consumption on a per-
product basis (except that Factory A does record actual
consumption of steel).  Thus, they rely on estimates based on
historical production norms.  See Pls.' Memo, at 32-35; Pls.'
Case Brief, at 44-47.  Factory A also suggests that because steel
accounts for over [  ] percent of its total costs of production,
its use of caps for the other, relatively minor inputs is
particularly reasonable.  See Pls.' Memo, at 33.

reliance on the old methodology used in multiple preceding reviews. See Shikoku Chemicals Corp. v. United States, 16 CIT 382, 795 F. Supp. 417 (1992) (overturning Commerce's use of a slightly improved methodology whose effect was, after four successive reviews finding zero or de minimis dumping, to deny revocation of the antidumping duty order, where the exporter demonstrated that it had set its prices in reliance on the old methodology). In the instant case, there is no evidence of the Factories' deliberate reliance on the old methodology; accounting limitations rather than any affirmative choice explain the Factories' continued preference for the old methodology. See Sanyo Elec. Co., Ltd. v. United States, 23 CIT __, 86 F. Supp. 2d 1232, 1243 (1999) (upholding Commerce's "disturbing" change in methodology in part because respondent could not demonstrate reliance on prior methodology).

There is a second limitation on Commerce's ability to change its methodology, however; as in every instance where an agency changes tack, it must provide a reasoned explanation for doing so. See RHP Bearings Ltd. v. United States, 24 CIT __, __, 120 F. Supp. 2d 1116, 1124 (2000) ("Although the application of the special rule in only two prior reviews does not form a long-established practice under the circumstances presented here, Commerce is under an obligation to explain the apparent inconsistency of its approach in this review and the two

preceding reviews."); <u>Cinsa, S.A. de C.V. v. United States</u>, 21
CIT 341, 349, 966 F. Supp. 1230, 1238 (1997) ("Commerce can reach
different determinations in separate administrative reviews but
it must employ the same methodology or give reasons for changing
its practice.").

In this case, Commerce did not provide a sufficient
explanation. Instead, in response to the plaintiffs' objections
to the change in methodology, it engaged in semantic
absurdities[36] and then explained in the broadest terms that
"verification objectives, testing, and results vary with the
review segment, company, and facts." <u>Final Results</u>, 64 Fed. Reg.
at 43,665. About its change in methodology Commerce said no
more, except to cite as evidence of its consistent approach the
final results from a different proceeding that do not, in fact,
appear to demonstrate such consistency at all. <u>See</u> <u>Natural
Bristle Paintbrushes and Brush Heads from the PRC; Final Review
Results of Antidumping Duty Admin. Review</u>, 64 Fed. Reg. 27,506,
27,510 (May 20, 1999) ("[A]t no time during the verification or
in the preliminary results of review, did [Commerce] attribute
the verification failure of [the respondent's] supplier to the
quality of its financial statements."). Accordingly, the Court

---

[36] "It is not entirely accurate to say that [we] accepted
'caps' in previous reviews. Rather, . . . we confirmed that
. . . the 'caps' were reasonable approximations of actual
consumption. As such we used this data to calculate NV." <u>Final
Results</u>, 64 Fed. Reg. at 43,665.

finds that Commerce has failed to provide a reasoned explanation for its change in methodology.[37] The Court remands this issue in order that Commerce may now do so.

## 2. Factory B's unreported factors of production

At verification, Commerce found that Factory B had failed to report three factors of production--[

]. The plaintiffs argue that under Commerce's precedent, Factory B was correct not to report these three items as factors of production, because they are not physically incorporated into the final product. See Pls.' Memo, at 36-38; Pls.' Case Brief, at 53-55. Commerce does not respond to this claim in its briefs before the Court; in the Final Results, Commerce merely stated that "[t]here was no way to confirm these claims at verification." 64 Fed. Reg. at 43,667.

The Court agrees with the plaintiffs that Commerce's historical practice has been to treat not as factors of production, but rather as factory overhead, those items that are not physically incorporated into the subject merchandise. See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Brake Drums and Brake Rotors from the PRC, 62 Fed. Reg. 9,160, 9,169 (Feb. 28, 1997) ("We agree that [six items] are indirect materials and should be treated as part of factory

---

[37] The same analysis applies to Commerce's findings regarding Factory A's lack of records tying its purchases of steel to its consumption of steel.

overhead, because the function of these materials is to 'assist' in the manufacturing process and do [sic] not enter physically into the composition of the finished product."). In fact, Commerce made a similar finding in an earlier review of the antidumping duty order at issue in this case. See Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the PRC; Final Results of Antidumping Duty Admin. Reviews, 60 Fed. Reg. 49,251, 49,254 (Sept. 22, 1995) ("We agree with respondents that pellets and detergent should be considered as factory overhead, and have changed our analysis accordingly. These items . . . are not physically incorporated into the subject merchandise. As such, they should not be valued as direct material inputs in the production of the subject merchandise."). In the instant case, the verifiers' report strongly suggests that the three unreported alleged factors of production, [                                    ], also were not physically incorporated into the subject merchandise. See Pls.' App. 18, [Factory B]: Report on the Verification of Factors Information Submitted in the Administrative Review Covering February 1, 1997, through January 31, 1998 ("Factory B Verification Report"), at 6. The plaintiffs have thus made a prima facie case that Commerce erred in determining that it these three items were unreported factors of production.

Again, Commerce has failed sufficiently to explain its

apparent change in methodology and departure from precedent.  Its
bare assertion that the claims could not be confirmed at
verification is unconvincing; the verifiers observed with their
own eyes the purposes for which the three items were put to use.
See id.  If, nevertheless, they continued to entertain any doubts
as to whether the three items were physically incorporated, then
Commerce should have stated so.  Instead, Commerce's tendency to
disguise its lack of thoroughness through vague and nonresponsive
assertions does a disservice both to the respondents and to this
Court.

The Court remands this issue to Commerce with instructions
that, unless Commerce can demonstrate that it has changed its
methodology (and post hoc rationalizations will not suffice for
this purpose) or can adduce substantial evidence showing that
Factory B failed to prove that the three items were not
physically incorporated, it must find that Factory B did not fail
to report any factors of production.

## II. Commerce's Decision to Apply the PRC-Wide Rate is Contrary to Law

The plaintiffs also protest Commerce's decision to deny
separate rates to FMEC and SMC, and instead to use the PRC-wide
rate.  Under U.S. antidumping law, special rules apply to the
determination of normal value of subject merchandise exported
from nonmarket economy countries.  See 19 U.S.C. § 1677b(c)
(1994).  For purposes of the antidumping statutes, the PRC is a

nonmarket economy pursuant to 19 U.S.C. § 1677(18) (1994).

Commerce permits individual exporters in a nonmarket economy to receive separate, company-specific rates, by demonstrating that they operate independently of central government control. See Manganese Metal From the PRC; Final Results and Partial Rescission of Antidumping Duty Admin. Review, 63 Fed. Reg. 12,440, 12,441 (March 13, 1998). However, there is a presumption of state control; the exporter must prove both de jure and de facto independence. See Final Determination of Sales at Less Than Fair Value: Sparklers From the PRC, 56 Fed. Reg. 20,588, 20,589 (May 6, 1991). Evidence that Commerce will consider in support of a claim of de jure independence includes: "(1) An absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; or (3) any other formal measures by the government decentralizing control of companies." Coalition, 23 CIT at __, 44 F. Supp. 2d at 242 (citing Sparklers From the PRC, 56 Fed. Reg. at 20,589). Factors that are probative of de facto independence include:

> (1) whether each exporter sets its own export prices independently of the government and other exporters;
> (2) whether each exporter can keep the proceeds from its sales;
> (3) whether the Respondent has authority to negotiate and sign contracts and other agreements; and
> (4) whether the Respondent has autonomy from the government in making decisions regarding the selection of management.

Coalition, 23 CIT at __, 44 F. Supp. 2d at 243; <u>Notice of Final</u>

<u>Determination of Sales at Less Than Fair Value: Silicon Carbide</u>

<u>from the PRC</u>, 59 Fed. Reg. 22,585, 22,587 (May 2, 1994).

Commerce has previously stated that "once a Chinese company

has demonstrated that it is entitled to a separate rate, unless

there is an indication that its status may have changed, it is

not necessary for that company to resubmit data supporting a

separate rate during subsequent reviews." <u>Certain Iron</u>

<u>Construction Castings from the PRC; Final Results of Antidumping</u>

<u>Admin. Review</u>, 57 Fed. Reg. 24,245, 24,246 (June 8, 1992).

Although FMEC and SMC apparently established that they were

entitled to separate rates in each of the preceding reviews,[38]

Commerce nevertheless included questions on the separate rates

issue in its initial questionnaires to FMEC and SMC.

_____

[38] The plaintiffs made this unsubstantiated allegation in their submissions to Commerce and to this Court. <u>See</u> Pls.' App. 3, Antidumping Admin. Review--HFHTs for the PRC--FMEC Response to Department's April 23, 1998 Questionnaire--Section A ("FMEC's Questionnaire Response"), at 2; Pls.' Memo. at 40. Commerce acknowledged in the <u>Preliminary Results</u> that FMEC and SMC had received separate rates in "several previous segments of these proceedings," including the 1996-97 reviews. 64 Fed. Reg. at 5,772. In addition, the public record supports the plaintiffs' claim. <u>See</u> <u>Heavy Forged Hand Tools From the PRC; Final Results of Antidumping Duty Admin. Reviews</u>, 62 Fed. Reg. 11,813, 11,818-19 (March 13, 1997) (noting that FMEC and SMC had received separate rates for the 1994-95 reviews and assigning separate rates for the 1995-96 reviews); <u>Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the PRC; Amendment of Final Results of Antidumping Duty Admin. Review</u>, 61 Fed. Reg. 24,285, 24,286 (May 14, 1996) (noting that FMEC and SMC received separate rates for the 1992-93 reviews).

In their questionnaire responses, both FMEC and SMC noted that nothing had changed with regard to their independent status since the previous reviews.  See FMEC's Questionnaire Response at 2; Pls.' App. 13, Antidumping Admin. Review--HFHTs for [sic] the PRC--SMC Response to Department's April 23, 1998 Questionnaire-- Section A ("SMC's Questionnaire Response"), at 2.  In answering each of Commerce's questions, both FMEC and SMC made a convincing prima facie case of de jure and de facto independence.  With regard to their legal autonomy, both FMEC and SMC explained that they are independent from the national, provincial, and local governments, and possess business licenses that permit the import and export of a range of equipment, machinery, and other industrial and manufacturing products, but otherwise contain no restrictive stipulations.  Although each is supervised by a provincial administrative agency, they are solely responsible for their business decisions.  FMEC's Questionnaire Response, at 2-4; SMC's Questionnaire Response, at 2-4.  They also provided copies of the national law decentralizing trading companies, as well as their business licenses.  FMEC's Questionnaire Response exhs. 1 & 2; SMC's Questionnaire Response exhs. 1 & 2.  To prove independence in fact, FMEC and SMC alleged that they set their own prices, actively competed with other Chinese exporters of the subject merchandise, kept their own profits, made their own business decisions, and selected their own managers.  FMEC's

Questionnaire Response at 2-8; SMC's Questionnaire Response at 2-9.  Commerce acknowledged in the Preliminary Results that these responses were "complete."  64 Fed. Reg. at 5,772.  Had it been otherwise, Commerce would have been obliged to request further information.  See Sigma Corp. v. United States, 17 CIT 1288, 1303, 841 F. Supp. 1255, 1267 (1993) ("The burden of proof to show that a company is independent is on the respondent, but if it has not supplied enough information, the burden shifts to Commerce to ask for more information."), aff'd in part and rev'd in part on other grounds, 15 Fed. Cir. (T) __, 117 F.3d 1401 (1997).

"Once an exporter has submitted information to establish its independence from the state, it then becomes Commerce's duty to verify the information submitted by the respondent."  Id. at 1302, 841 F. Supp. at 1266.  However, the verification outlines that Commerce issued to FMEC and SMC did not indicate that Commerce intended to verify their answers to the separate rates questions.  See FMEC Verification Outline; SMC Verification Outline.  The verifying officials did not verify any information specifically related to the separate rates issue, except to review FMEC's and SMC's business licenses.  See FMEC Verification Report; Pls.' App. 15, SMC: Report on the Verification of Sales Info. Submitted in the Admin. Review Covering February 1, 1997, through January 31, 1998 ("SMC Verification Report").  Nor is any

item related to separate rates listed among the "issues

discovered at verification" in the verification reports.  See

FMEC Verification Report, at 2; SMC Verification Report, at 2.

Nevertheless, Commerce determined that FMEC and SMC had not

established their entitlement to separate rates.  In a single

brief paragraph, Commerce explained its reasoning as follows:

> [T]he failure to satisfy requests for information that
> would confirm various elements of these firms'
> questionnaire responses directly compromised the
> information that formed the basis of these entities'
> separate rates' [sic] claims.  More specifically, we
> determined that, due to the nature of the verification
> failures of SMC and FMEC and the inadequacy of their
> cooperation, it was not possible to confirm information
> regarding these entities' affiliations, ownership
> arrangements, and corporate structure.  Thus, even
> though we did not directly examine all aspects of these
> firms' separate rates' [sic] claims at verification,
> the separate rates' [sic] claims were called into
> question because the data unsuccessfully addressed at
> verification were key to our separate rates' [sic]
> analysis.

Final Results, 64 Fed. Reg. at 43,669 (citation omitted).

Commerce's explanation explains nothing.  The essence of a

separate rates analysis is to determine whether the exporter is

an autonomous market participant, or whether instead it is so

closely tied to the communist government as to be shielded from

the vagaries of the free market.[39]  None of the putative

---

[39]  "The antidumping statute recognizes a close correlation
between a nonmarket economy and government control of prices,
output decisions, and the allocation of resources."  Sigma Corp.
v. United States, 15 Fed. Cir. (T) __, __, 117 F.3d 1401, 1405-06
(1997).

verification failures identified by Commerce appear to relate to

this issue at all,[40] an omission made especially glaring by the

fact that FMEC and SMC had demonstrated their independence in

numerous consecutive preceding reviews.  Accordingly, the Court

finds that Commerce has failed to show by substantial evidence

that FMEC and SMC were not entitled to separate rates.

## III. Commerce's Decision to Apply Adverse Facts Available is Contrary To Law

The final issue in this case concerns Commerce's decision to

apply adverse facts available.  Under the United States

antidumping laws, if a respondent withholds or fails to provide

information requested by Commerce, significantly impedes a

proceeding, or provides information that is not verifiable,

Commerce shall "use the facts otherwise available in reaching the

applicable determination."  19 U.S.C. § 1677e(a)(2) (1994).  If

---

[40] For example, the Final Results refer to Commerce's
inability "to confirm information regarding these entities'
affiliations."  64 Fed. Reg. at 43,669.  The only unresolved
affiliation issue discussed in the AFA Memo involves FMEC's and
SMC's relationships with their respective affiliated United
States entities, which bear on the issue of determining a
constructed export price, not on their affiliation (or lack
thereof) with any Chinese government-dominated entities.

By way of contrast, in Tapered Roller Bearings and Parts
Thereof, Finished and Unfinished, From the PRC; Preliminary
Results of Antidumping Admin. Review and Partial Termination of
Admin. Review, 62 Fed. Reg. 36,764 (July 9, 1997), Commerce
denied separate rates to one exporter that refused to allow on-
site verification, and to another exporter that did not timely
respond to a supplemental questionnaire and whose "initial
questionnaire response was incomplete, particularly with regard
to separate rates issues . . . ."  Id. at 36,768 (emphasis
added).

Commerce finds that the respondent "has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . [Commerce] may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).

The plaintiffs argue that even if Commerce properly determined that FMEC, SMC, and the Factories failed verification (and must therefore use facts available), it may not use AFA because it has not demonstrated that they failed to cooperate to the best of their ability.  Pls.' Memo, at 18.  In particular, they claim that the unreported sales were <u>de minimis</u> and that the failure to report them was inadvertent, the result of inadequate computer systems.  <u>Id.</u> at 20.  They also argue that because Commerce calculated separate rates for each of the four classes of subject merchandise, FMEC's and SMC's failure to report sales for one or two classes does not allow Commerce to use AFA for the other classes.  <u>Id.</u> at 16-17.  Finally, the plaintiffs maintain that under applicable CIT precedent, Commerce may not apply AFA unless it makes a specific finding that they failed to act to the best of their ability, <u>id.</u> at 19-20, and that such failure was deliberate or willful.  Reply Brief of Pls. FMEC and SMC, at 15.

Commerce argues that AFA is appropriate because it specifically found that the plaintiffs had failed to provide sufficient sales information for the calculation of an accurate

dumping margin. See Commerce's Memo, at 30. Commerce claims

that the plaintiffs should have known from their experience in

prior reviews that they needed to be more vigilant about

reporting sales, id. at 34, and that under CIT precedent no proof

of willfulness or deliberateness is necessary to impose AFA. Id.

at 37. In Commerce's view, the plaintiffs' lack of advanced

computer capabilities does not "entitle[] them to underreport and

affirmatively misstate during a review." Id. at 35. Commerce

also argues that the plaintiffs' total failure to report sales of

bars/wedges is particularly egregious because they had asked

Commerce to rescind its review of that class of merchandise. Id.

at 35.

The Court finds that Commerce's decision to impose AFA is

not supported by substantial evidence and is not otherwise in

accordance with law. As the parties have noted, "Once Commerce

has determined under 19 U.S.C. § 1677e(a) that it may resort to

facts available, it must make additional findings prior to

applying 19 U.S.C. § 1677e(b) and drawing an adverse inference."

Ferro Union, Inc. v. United States, 23 CIT __, __, 44 F. Supp. 2d

1310, 1329 (1999); accord Mannesmannrohren-Werke AG v. United

States ("Mannesmannrohren-Werke I"), 23 CIT __, __, 77 F. Supp.

2d 1302, 1313-14 (1999); Kawasaki Steel Corp. v. United States,

24 CIT __, __, 110 F. Supp. 2d 1029, 1034 (2000) ("It has been

well established by the court that a 'mere recitation of the

relevant [AFA] standard is not enough for Commerce to satisfy its obligation under the statute.'") (citations omitted).  "In order for its finding to be supported by substantial evidence, 'Commerce needs to articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance to the progress of its investigation.'" Nippon Steel Corp. v. United States ("Nippon Steel I"), 24 CIT __, __, 118 F. Supp. 2d 1366, 1378 (2000) (quoting Mannesmannrohren-Werke I, 23 CIT at __, 77 F. Supp. 2d at 1313-14 (omitting citation)).

The Court agrees with the plaintiffs that Commerce has not adduced substantial evidence to support the application of AFA, in either the AFA Memo, the Preliminary Results, the Final Results, or its briefs before this Court.  The author of the AFA Memo, one of the verifying officials, listed the major problems at verification, and then proceeded to assume that such problems supported the use of AFA, without discussing why, effectively skipping two steps of a proper AFA analysis.  See AFA Memo, at 3 (stating, without first determining that facts available should apply or that plaintiffs had not acted to the best of their abilities, that the only issue was the choice between partial AFA and total AFA).

In the Final Results, as in the Preliminary Results, Commerce gave two reasons for its decision to apply AFA: (1) the

PRC entity had failed to cooperate; and (2) "the accuracy of SMC's and FMEC's individual responses could not be substantiated at verification. These verification failures were the direct result of these companies' failure to supply a wide variety of information." Final Results, 64 Fed. Reg. at 43,667-68; see also Preliminary Results, 64 Fed. Reg. at 5,772 (using nearly identical language). Commerce gave no further explanation, except to refute the plaintiffs' claim that its decision in a different proceeding precluded the use of AFA under the facts of this review. Final Results, 64 Fed. Reg. at 43,668. Commerce's brief before this Court continues in this vein, arguing that Commerce specifically found that plaintiffs had provided insufficient sales information, and that in light of the plaintiffs' experience with antidumping investigations, ipso facto they had not cooperated to the best of their abilities. See Pls.' Memo, at 30, 34.

Commerce's reasoning is inadequate, because it suggests that AFA inevitably follows from its finding that the plaintiffs failed verification. Ample precedent from the CIT demonstrates that AFA is not a mere tautology, however. Instead, Commerce must show that FMEC and SMC had the ability to comply but did not do so. See Nippon Steel Corp. I, 24 CIT at __, 118 F. Supp. at 1378-79 ("At a minimum, Commerce must find that a respondent could comply, or would have had the capability of complying if it

knowingly did not place itself in a condition where it could not comply."); Borden, Inc. v. United States, 22 CIT 233, 265, 4 F. Supp. 2d 1221, 1247 (1998) ("Given the history of [respondent's] numerous communications, explanations, and submissions to Commerce, if there is no evidence that [respondent] could have provided all the information Commerce wanted in a timely manner, Commerce may not draw an adverse inference."), aff'd in part sub nom. F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 18 Fed. Cir. (T) __, 216 F.3d 1027 (2000), rev'd in part on other grounds sub nom. Borden, Inc. v. United States, 2001 WL 312232 (Fed. Cir. 2001) (unpublished opinion); Krupp Thyssen Nirosta GMBH v. United States, slip op. 00-89, at 14-15, 2000 WL 1118114, at *7 (Ct. Int'l Trade July 31, 2000) (remanding for reconsideration of AFA because Commerce failed to address the "critical issue . . . whether [respondent] had the resources available to it prior to verification to discover the errors") (emphasis in original).  Moreover, even if Commerce does demonstrate that the respondent had the ability to comply, if the respondent pleads that "it did not do so because of simple inadvertence, [Commerce] must show more."  See Nippon Steel Corp. v. United States ("Nippon Steel II"), 25 CIT __, __, 146 F. Supp. 2d 835, 841 (2001).  Possible factors include multiple erroneous submissions, non-responsive answers to multiple inquiries, and other evidence of a "pattern of unresponsiveness" or that

"strongly indicat[es] a specific intent on the part of the respondent to evade [Commerce's] requests for information." Id. at 840 (internal quotation marks omitted) (distinguishing Mannesmannrohren-Werke AG v. United States ("Mannesmannrohren-Werke II"), 24 CIT __, __, 120 F. Supp. 2d 1075, 1077-80, 1084-87 (2000)).

Although Commerce is correct that it need not find willful or deliberate noncompliance, see Nippon Steel I, 24 CIT at __, 118 F. Supp. 2d at 1378 ("A finding of willfulness, . . . in the sense of a deliberate decision not to comply is not always a prerequisite to the drawing of an adverse inference."), where it cannot demonstrate such willfulness, it must tread especially carefully. See Nippon Steel II, 25 CIT at __, 146 F. Supp. 2d at 841-42 ("[T]hose cases that do not suggest willfulness on the part of the respondent pose particular challenges for [Commerce] to draw appropriate lines."). The more complex the review, the greater the need for such restraint. See id. at __, 146 F. Supp. 2d at 841 ("[The respondent's] efforts must also be viewed in the context of what [Commerce] recognized as a difficult case raising 'unique and complex issues.'"); Final Results, 64 Fed. Reg. at 43,660 (acknowledging that Commerce had been obliged to extend the deadline for issuing the Final Results because the review was "extraordinarily complicated"). "[A] completely errorless investigation is simply not a reasonable expectation. Even the

most diligent respondents will make mistakes, and Commerce must devise a non-arbitrary way of distinguishing among errors." Nippon Steel II, 25 CIT at __, 146 F. Supp. 2d at 841 n.10.

There is abundant record evidence tending to show that most of the problems associated with verification, from the unreported sales (and the concomitant request to rescind the review with respect to bars/wedges) to the Factories' inability to trace caps to accounting records, were inadvertent and directly attributable to the inadequate accounting and computing resources of the plaintiffs and their suppliers' factories. Commerce, however, declined to take this factor into account. See Commerce's Memo, at 34 ("[P]laintiffs' claims that its [sic] ommissions [sic] are merely inadvertent, unintentional, and insignificant, depreciates Commerce's role in gathering accurate sales data."). This refusal is not in accordance with law. See Borden, 22 CIT at 264, 4 F. Supp. 2d at 1246 (remanding for reconsideration of AFA where "Commerce seem[ed] to have leaped to the conclusion that [respondent] willingly did not comply and to have misapprehended, or not adequately considered, [respondent's] repeated statements that it did not have a cost accounting system") (emphasis in original).

Commerce's claim that the plaintiffs' experience in preceding reviews exacerbates their failures in this one likewise fails. Their experience would be germane only if Commerce could

show that prior reviews had served to give them notice of deficiencies in their cooperation, see Nippon Steel II, 25 CIT at __, 146 F. Supp. 2d at 839 ("[Commerce] has not shown . . . that the inadvertence claimed in this case also occurred in another review, or that the specific element focused on in a previous review . . . is also at issue in this case."); NSK Ltd., 19 CIT at 1026, 896 F. Supp. at 1274 (noting that Commerce had "explicitly warned" respondent during the first review that its reporting methodology would not be accepted in subsequent reviews), or if Commerce could point to their specific actions in prior reviews that would tend to prove they had the ability to cooperate in the present review. See Nippon Steel II, 25 CIT at __, 146 F. Supp. 2d at 841. See also Gourmet Equip., slip op. 00-78, at 16, 2000 WL 977369, at *4 ("Past participation may be relevant to notice, knowledge, and reliance issues."). Instead, the record suggests that the plaintiffs' sudden failures in this review owe more to changes in Commerce's methodology than to any newfound disinclination to cooperate. Within the constraints discussed above, Commerce has wide latitude to adapt its methodology, but when by doing so it imposes new burdens on respondents, it must take those burdens into account in making its AFA decision.[41]

---

[41] Evidence of this factor in the present review is particularly strong with respect to the Factories, who did not even receive notice in the verification outlines that Commerce

Commerce's decision to apply AFA is also unsupported by substantial evidence because it was based in considerable part on the lack of cooperation of the PRC entity.  For the reasons discussed <u>supra</u>, in Part II, FMEC and SMC are entitled to separate rates.  Therefore, it would be grossly unfair to hold them responsible for MOFTEC's non-responsiveness to a separate rates inquiry.[42]

Accordingly, the Court remands so that Commerce may reconsider its decision to apply AFA to SMC, as well as to FMEC if Commerce determines on remand that FMEC or the Factories failed verification.  In so ordering, the Court does not predetermine the outcome on remand, as there are numerous ambiguities in the record.

---

intended to require tracing of caps to accounting statements. <u>See</u> FMEC Verification Outline, accompanying letter at 2; SMC Verification Outline, accompanying letter at 2; Pls.' Case Brief, at 51.  <u>Cf.</u> <u>NSK Ltd.</u>, 19 CIT at 1026, 896 F. Supp. at 1274.

[42] In an antidumping investigation, under some circumstances Commerce may impose AFA on a respondent for the failure of a non-respondent to cooperate with the investigation, although its ability to do so is more restricted than under the precursor to the AFA statute. <u>See, e.g.</u>, <u>Helmerich & Payne, Inc. v. United States</u>, 22 CIT 928, 932 n.6, 24 F. Supp. 2d 304, 309 n.6 (1998); <u>Kawasaki Steel</u>, 24 CIT at __, 110 F. Supp. 2d at 1033-39 (upholding use of AFA where respondent failed to use its best efforts to persuade its U.S. affiliate, a petitioner in the review, to supply requested information necessary to determine CEP).  In all such cases, however, there is some sort of privity, whether contractual, commercial, or ownership, between the respondent and the uncooperative third party. In the absence of evidence of such privity between FMEC or SMC and MOFTEC, it is unreasonable to impute MOFTEC's silence to the plaintiffs.

## CONCLUSION

For all of the foregoing reasons, the Court sustains Commerce's <u>Final Results</u> in part and remands in part.  A separate order will be entered accordingly.

_____

**Judge Richard W. Goldberg**

**Date: September 28, 2001**
**New York, New York**